# United States Tax Court

T.C. Memo. 2025-129

MARK CHERNOMORDIKOV,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

JESSICA M. CHERNOMORDIKOV, a.k.a. JESSICA STEINER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

———————

Docket Nos. 35205-21, 35297-21.          Filed December 15, 2025.

———————

*Sandeep Singh*, for petitioners.

*Matthew P. Crouch*, *Lori Katrine Shelton*, *Lesley A. Hale*, and *Michael Skeen*, for respondent in Docket No. 35205-21.

*Matthew P. Crouch*, *Lori Katrine Shelton*, and *Lesley A. Hale*, for respondent in Docket No. 35297-21.


## MEMORANDUM FINDINGS OF FACT AND OPINION

PUGH, *Judge*: In these consolidated cases Mark and Jessica Chernomordikov (who married on June 22, 2013)[1] seek redetermination of deficiencies and additions to tax determined by the Internal Revenue Service (IRS or respondent) in two Notices of Deficiency, both dated

---

[1] For ease we refer to Jessica as Mrs. Chernomordikov throughout this opinion.

[*2] September 30, 2021. The IRS determined the following deficiencies and additions to tax for Mr. Chernomordikov's tax years 2012 through 2014:

| Year | Deficiency | Additions to Tax | | |
|---|---|---|---|---|
| | | § 6651(a)(2)[2] | § 6651(f)[3] | § 6654 |
| 2012 | $1,713,102 | $428,276 | $1,241,999 | $30,713 |
| 2013 | 4,525,267 | 1,131,317 | 3,280,819 | 81,260 |
| 2014 | 2,881,315 | 720,329 | 2,088,953 | 51,739 |

The IRS determined the following deficiencies and additions to tax for Mrs. Chernomordikov's tax years 2013 and 2014:[4]

| Year | Deficiency | Additions to Tax | | |
|---|---|---|---|---|
| | | § 6651(a)(1) | § 6651(a)(2) | § 6654 |
| 2013 | $2,170,145 | $488,283 | $542,536 | $38,969 |
| 2014 | $1,321,524 | 297,343 | 330,381 | 23,730 |

Before trial the parties resolved all issues concerning tax year 2014 and narrowed the issues for tax years 2012 and 2013. After those concessions, the issues remaining for decision are whether (1) Mr. Chernomordikov is liable for tax on other income of $3,271,586 and

---

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

[3] The IRS determined an addition to tax for failure to file under section 6651(a)(1) in the alternative to an addition to tax for fraudulent failure to file under section 6651(f).

[4] The parties appear to have stipulated two versions of the Notice of Deficiency covering Mrs. Chernomordikov's tax years 2013 and 2014. One, dated September 30, 2021, is attached to Mrs. Chernomordikov's Petition in the case at Docket No. 35297-21 and included as a stipulated Exhibit in the parties' First Amended First Stipulation of Facts in that case. Those are the numbers we have listed above. An undated copy (reflecting a deficiency of $2,122,564 for 2013 and $1,320,565 for 2014 along with different additions to tax) is included as a stipulated Exhibit in the First Amended First Stipulation of Facts in the lead case at Docket No. 35205-21. We rely upon the former for our jurisdiction because it is the Notice of Deficiency upon which the case at Docket No. 35297-21 is based. *See* § 6213(a).

**[\*3]** $4,059,294 for tax years 2012 and 2013, respectively;[5] (2) Mrs. Chernomordikov is liable for tax on other income of $238,525 for tax year 2013;[6] (3) Mr. Chernomordikov is entitled to claim cost of goods sold as a reduction to gross receipts from ONY Sales, Inc. (ONY Sales), for tax years 2012 and 2013; (4) petitioners are each liable for tax on a community property share of income or instead are entitled to married filing jointly status for tax year 2013; and (5) they are liable for certain additions to tax.

## FINDINGS OF FACT

The facts we find are drawn from the pleadings, trial testimony, and documents admitted into evidence. Some of the facts have been stipulated and are so found. We have doubts about the credibility of the witnesses for both parties on the basis of our personal observations of them at trial. We therefore rely more heavily on the documents admitted into evidence than on testimony, particularly when the testimony appeared to be self serving. Petitioners resided in California when they timely filed their Petitions.

I. *Petitioners' background*

Mr. Chernomordikov was born in Azerbaijan and immigrated to the United States with his mother, Marina Sarnova, and stepfather, Georgi Frilov. He graduated from high school and attended two community college classes. He has held various sales positions: selling eyeglasses and sunglasses at a retail store, cars at a dealership, and door-to-door sales to optical stores before working for ONY Sales.

Mrs. Chernomordikov attended college where she studied business and marketing. She was not employed during the years

---

[5] In petitioners' Posttrial Brief they present this issue as whether Mr. Chernomordikov is liable for other income of $3,348,986 for 2012, and whether petitioners are liable for unreported income of $4,179,411 for 2013. For simplicity we use respondent's figures here but leave Rule 155 computations to the parties.

[6] The dated Notice of Deficiency states that Mrs. Chernomordikov has other unreported income of $239,447. The undated Notice states that Mrs. Chernomordikov has other unreported income of $238,525. In their Posttrial Briefs the parties cite the unreported income from the undated Notice; as we explain below we will treat that as a concession by respondent. Neither Notice matches the bank deposits analysis. *See infra* p. 10 and note 14.

[*4] relevant to these cases and left household finances to Mr. Chernomordikov.[7]

## II. *Business involvement*

### A. *ONY Sales*

The issues in these cases primarily stem from Mr. Chernomordikov's involvement with ONY Sales. ONY Sales sold electronics online. Before his stepfather died in August 2011 Mr. Chernomordikov was only marginally involved in the business (e.g., he helped with paperwork). When his stepfather died, Mr. Chernomordikov stepped in to help his mother, then the sole shareholder, run the business. During the years in issue he worked for ONY Sales; his mother played no role. He did not receive a paycheck from ONY Sales, but he did use the money from ONY Sales for personal expenses.

Mr. Chernomordikov typically did not receive (or require) receipts or invoices from the individuals he identified as suppliers: Alfonso Rueda and Marco Orozco. And, following the practice of his late stepfather, he usually paid for ONY Sales' products in cash. He did not question why the suppliers preferred cash payments. He regularly withdrew large sums of cash from ONY Sales' bank accounts and used his Social Security number rather than ONY Sales' employer identification number for the currency transaction reports required by the banks for cash withdrawals of $10,000 or more. *See* 31 U.S.C. § 5313.

Mr. Chernomordikov paid suppliers indirectly as well. For example, he transferred a total of $825,000 from ONY Sales' bank accounts to title company escrow accounts to fund the purchase of houses for Messrs. Rueda and Orozco. Respondent conceded that these transfers did not constitute income to Mr. Chernomordikov.

Although he did not own an interest in ONY Sales, in 2012 and 2013 Mr. Chernomordikov treated ONY Sales' funds as his own; he "didn't really feel like there was a difference." For example, he used

---

[7] At trial Mrs. Chernomordikov added very little to the Court's understanding of the relevant facts because of repeated claims that she did not know or did not remember even basic background facts. For example, she originally testified that she went to college for business and marketing and thought she got a college degree. But on cross she testified she was not sure and could not recall whether she graduated.

[*5] funds from ONY Sales to purchase luxury vehicles, such as a Lamborghini, a Ferrari, a Rolls Royce, and a Mercedes-Benz.

Mr. Chernomordikov used ONY Sales' funds in other ways too. Between 2013 and 2015 he lent his friend, Alex Lowry, $1.7 million from ONY Sales' funds without a written loan agreement. Mr. Lowry owned a used car dealership, Elite Motor Cars (also known as ANM Sales, Inc. (ANM Sales)).

### B.    *Other businesses*

Mr. Chernomordikov was also involved in other businesses,[8] including ONY Homes, LLC (ONY Homes). ONY Homes was formed on September 13, 2013, and "flipped" homes and developed land into residential property. Petitioners each owned a 50% membership interest in ONY Homes.

### III.    *Bookkeeping and tax return preparation services*

Mr. Chernomordikov hired Melvin Lee and Golden Bay Tax & Bookkeeping Services (Golden Bay) to assist with bookkeeping and tax return preparation services for the 2011 through 2016 tax years. Crizaline Nueve and Cristella Ocampo were bookkeepers with Golden Bay. Mr. Lee—a former IRS Revenue Agent who held himself out as a tax specialist and an Enrolled Agent—later was investigated for tax crimes by the IRS Criminal Investigation Division.

Golden Bay used the accounting software QuickBooks to track ONY Sales' income and expenses. Mr. Chernomordikov provided some documentation to Golden Bay for ONY Sales' bookkeeping. For example, he provided bank statements[9] to Golden Bay but he did not provide receipts related to ONY Sales' cost of goods sold.

Mr. Lee was involved in the preparation of some individual tax returns for Mr. Chernomordikov (as well as for Ms. Sarnova). Both Mr. Lee and Golden Bay participated in the preparation of certain Forms 1120, U.S. Corporation Income Tax Return, for ONY Sales. They were

---

[8] Some evidence in the record suggest that Mr. Chernomordikov had ties to other businesses as well, including ANM Sales, MNJ Sales, and ONY Vision, Inc. The extent of his ownership in these entities, if any, is irrelevant to our analysis here.

[9] Some evidence in the record suggests Mr. Chernomordikov provided bank statements to Golden Bay, but we cannot determine from the record before us which accounts were included or whether Golden Bay knew of all the accounts.

[*6] also involved in the audit of ONY Sales as well as the audit of petitioners' individual tax returns.

Draft engagement letters with Golden Bay listed fees for certain services; for certain tax services the fee was a percentage of the tax savings. An email from Ms. Nueve in August 2014 stated that they would prepare the 2013 tax returns for ONY Sales, ONY Homes, MNJ Sales and petitioners individually; it added that "[t]he fee for the above corporate tax returns and individual tax returns is 5% of our agreed payment proposal." A followup email from Mr. Lee in September 2014 stated that the ONY Sales 2013 corporate tax return was filed and accepted and stated that Mr. Lee's "fee for strategizing and reworking the tax returns was 5% of the tax savings of $1,000,607."

IV.  *Tax compliance (or lack thereof)*

A.  *Tax year 2011*

Mr. Chernomordikov's tax compliance for 2011 consisted of reporting wages and tax withholding from Form W–2, Wage and Tax Statement. In October 2012 Mr. Chernomordikov filed a 2011 Form 1040, U.S. Individual Income Tax Return, prepared by Mr. Lee. The 2011 Form 1040 reported that Mr. Chernomordikov's only income was $19,939 from cancellation of indebtedness and that his tax liability was $1,147. He paid his reported 2011 federal income tax liability.

B.  *Tax year 2012 and beyond*

Mr. Chernomordikov did not receive Forms W–2 or any other third-party information reporting of payments to him from ONY Sales for 2012 and 2013. He was made aware of possible issues with the lack of information reporting. An email from Ms. Nueve to Mr. Chernomordikov, dated October 5, 2013, stated in part:

> We may need to start you on some kind of payroll because if you have a high mortgage interest, it may show up on the IRS wage and income transcript and yet you have no payroll showing you can pay for the mortgage. Remember [ONY] Sales is a regular corporation and the income does not pass through you [sic] personal tax.

He was also made aware of possible issues with the filing of some of the returns handled by Mr. Lee. An email from Mr. Lee to Mr. Chernomordikov, dated July 14, 2016, stated in part:

**[*7]** I misspoke when we last conversed. The Ony Homes tax returns have not been filed. [Ms. Nueve] and I wanted the Ony Sales audit finished before the Ony Homes returns were filed.

Mr. Chernomordikov did not file Forms 1040 or pay his individual income tax for 2012 through 2014. Mrs. Chernomordikov did not file Forms 1040 or pay her individual income tax for 2013 and 2014.

Mr. Chernomordikov did not make estimated tax payments for 2012. And neither he nor Mrs. Chernomordikov made estimated tax payments for 2013 through 2016.

The IRS prepared a substitute for return (SFR) for each year for which petitioners did not file a tax return.

C. *Prepared but unfiled tax returns*

Mr. Lee and Golden Bay prepared tax returns for petitioners that were not filed with the IRS: two 2013 draft Forms 1040, two 2014 draft Forms 1040, one 2013 draft Form 1065, U.S. Return of Partnership Income, for ONY Homes, and two 2014 draft Forms 1065 for ONY Homes. Of these, one copy of a draft Form 1040 for 2013 is dated September 29, 2014, and one copy of a draft Form 1040 for 2014 is dated August 16, 2016. The record contains no draft returns for 2012. Mr. Lee and Golden Bay submitted draft tax returns to lenders for ONY Homes.

These tax returns conflict with other evidence in the record and raise more questions than they answer. For example, the 2013 draft Form 1065 for ONY Homes and the associated Schedule K–1, Partner's Share of Income, Deductions, Credits, etc., for Mr. Chernomordikov stated that he made a capital contribution of nearly $2.9 million. But his 2013 draft Forms 1040 reported very little income. And the 2013 draft Form 1065 reported no gross receipts. Nor did the 2014 draft Form 1065 report any gross receipts. The 2014 draft Form 1065 did list assets in excess of $5 million and losses of $4,590. It also listed the date the business started as "1/01/2013." But a bank account application for ONY Homes (account ending 5889), signed by Mr. Chernomordikov and dated September 26, 2013, stated ONY Homes had annual gross sales of $1.5 million. It stated the "Year Sales Reported" as April 15, 2013. The application also stated that ONY Homes was established on September 12, 2010 (rather than September 13, 2013) and that it was taxable as a C corporation rather than a partnership. And one of Mr.

**[\*8]** Chernomordikov's 2013 draft Forms 1040 selected married filing separately status.

V.    *The examinations*

   A.    *ONY Sales*

   IRS Revenue Agent Lona Ho (RA Ho) opened an examination regarding ONY Sales in April 2015. In June 2015 RA Ho interviewed Mr. Chernomordikov concerning his role in ONY Sales. Mr. Chernomordikov provided information regarding some (but not all) of the bank accounts to which he had access. He did not provide the names or contact information for any of ONY Sales' suppliers.

   ONY Sales provided QuickBooks records to RA Ho. She concluded that the records were altered after the start of the examination and therefore were unreliable. Notes taken by RA Ho summarizing an interview she conducted on June 30, 2015, as part of her examination stated that cash withdrawals without supporting records were recorded by ONY Sales' bookkeeper (Ms. Nueve) as "Loan to Shareholder."[10]

   The IRS disallowed ONY Sales' claimed cost of goods sold expenses for 2012 through 2014 and issued Notices of Deficiency for those tax years. ONY Sales petitioned this Court for redetermination at Docket Nos. 21079-16 and 10582-17. Both cases settled.

   B.    *Petitioners*

   The examination regarding ONY Sales prompted RA Ho to open an examination for Mr. Chernomordikov's tax years 2012 through 2016 and Mrs. Chernomordikov's for tax years 2013 and 2014.

   In September 2015 RA Ho again interviewed Mr. Chernomordikov—this time concerning his individual tax returns examination. RA Ho issued Information Document Requests concerning tax years 2012, 2013, and 2014, to which petitioners did not respond (nor did their representatives at the time, Mr. Lee and Golden Bay).

   RA Ho secured bank records for petitioners' known accounts and performed bank deposits analyses. RA Ho determined that Mr.

---

[10] Petitioners objected that RA Ho's notes from her audit regarding petitioners were hearsay when offered by respondent, and we agreed. Respondent did not raise a similar objection to her notes from the ONY Sales audit when offered by petitioners. We therefore have considered statements from the ONY Sales audit notes.

[*9] Chernomordikov made deposits into his personal accounts from ONY Sales' PayPal account, from other accounts, and from checks and cash. She concluded that Mr. Chernomordikov had $4,651,221 and $10,561,573 of unreported taxable deposits in 2012 and 2013, respectively; and that Mrs. Chernomordikov had $4,633,576 of unreported taxable deposits in 2013.[11] The bank deposits analysis for Mr. Chernomordikov from 2013 stated: "Per Bank Deposit Analysis above, the taxpayer unreported at least 50% of $10,561,573 community property income in 2013 taxable year." Likewise, the bank deposits analysis for Mrs. Chernomordikov stated: "Per Bank Deposit Analysis above, the taxpayer unreported at least 50% of $4,633,576 community property income in 2013 taxable year." Two accounts with taxable deposits of $28,327 and $4,366,327 appear on the 2013 bank deposits analyses for both petitioners.

The remaining "other income" adjustment for 2012 comprised deposits into ONY Sales' bank accounts that Mr. Chernomordikov then transferred to one of his personal accounts, funds that he withdrew from ONY Sales' bank accounts, and funds that were deposited into one of his personal bank accounts from ONY Sales' PayPal account. For 2013 the remaining "other income" adjustment consisted of ONY Sales' funds used for personal expenses and cash that Mr. Chernomordikov withdrew from ONY Sales' bank accounts.

In the bank deposits analysis RA Ho determined Mr. Chernomordikov made payments in the form of transfers and withdrawals from ONY Sales' bank accounts, including (but not limited to) the following:

(a) $383,913 to North American Title Co. in July 2012;

(b) $419,154 to Fidelity National Title in August 2012;

(c) $11,882 for a "deposit for backyard" in October 2012;

(d) $1,256,937 to Chicago Title Co. in October 2012;

(e) $400,000 to Gene Radding in November 2012;

---

[11] Respondent's Posttrial Opening Brief also notes that respondent made whipsaw adjustments to account for community property allocations.

[*10]     (f)   $68,573 to Creative Environments for a pool and pool equipment in December 2012;

          (g)   $21,786 "to Gester Contracting and Design" in December 2012;

          (h)   $106,000 for a Lamborghini in April 2013;

          (i)   transfers totaling $958,500 to ANM Sales in 2013;

          (j)   $235,500 for a Ferrari in September 2013;

          (k)   transfers totaling $1,044,285 to Old Republic Title Co. in September 2013;

          (l)   $1,143, $4,488, and $337 by check to the U.S. Treasury in Summer 2013; and

          (m)   $19,311 for property taxes on petitioners' home in September 2013.[12]

RA Ho also determined through the bank deposits analysis that Mr. Chernomordikov transferred money from ONY Sales' bank account to ONY Homes' bank account; she identified $4,366,326 in total taxable deposits into ONY Homes' bank account in 2013.

RA Ho determined that Mrs. Chernomordikov also had an "other income" adjustment for 2013 comprising deposits into her personal accounts that originated from ONY Sales' bank accounts. How respondent calculated the $238,525 sum listed in the Notice of Deficiency[13] is not explained; rather respondent seems to defend the amount in the Notice of Deficiency by pointing to the amount in the bank deposits analysis, which is slightly greater.[14]

---

[12] Excluded from this list are the transfers to fund the purchases of houses for Messrs. Rueda and Orozco as well as the loan to Mr. Lowry.

[13] As we explained above, *see supra* note 4, some of the confusion might be caused by the parties' stipulating two different Notices of Deficiency for Mrs. Chernomordikov, one dated and one undated, which show different deficiency amounts.

[14] The bank deposits analysis indicated that Mrs. Chernomordikov had $283,583 of taxable deposits into accounts that were under her name only. Respondent's Seriatim Reply Brief does not explain how he calculated the sum listed in the Notice of Deficiency but rather discusses the bank deposits analysis and bank

**[\*11]**                                                OPINION

I.        *The problem of the missing witness*

We first address an evidentiary issue: the absence of Mr. Lee. Citing *Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158, 1165 (1946), *aff'd*, 162 F.2d 513 (10th Cir. 1947), respondent argues that we should presume that Mr. Lee's testimony would not have supported petitioners' claims that he was to blame for their noncompliance because petitioners did not call Mr. Lee as a witness. Then again, neither did respondent. Respondent listed Mr. Lee in his pretrial memorandum as a potential witness but did not call him as a witness. At trial counsel for respondent stated that they served a trial subpoena on Mr. Lee but told him he did not have to appear on the first day of trial; rather they would call him if they wanted him to testify. Counsel for petitioners was not made aware that Mr. Lee would not appear until counsel for respondent raised the presumption issue at trial. Counsel for petitioners did not arrange for service of a trial subpoena on Mr. Lee, and petitioners' Pretrial Memorandum did not list Mr. Lee as a witness but did reserve the right to call any of the witnesses listed by respondent. Thus, Mr. Lee may have been available to both sides but neither chose to call him. Against this backdrop we do not believe any presumptions can or should be drawn about Mr. Lee's hypothetical testimony. We instead will consider his absence insofar as it may relate to the burden of proof each party must meet.

II.        *Burden of proof*

The taxpayer generally bears the burden of proving the determinations set forth in a Notice of Deficiency are in error. Rule 142(a)(1); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Section 7491(a)(1) provides that if the taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining his or her liability and satisfies the requirements of section 7491(a)(2), the burden of proof shifts to the Commissioner with respect to that issue. Petitioners have neither claimed nor introduced credible evidence sufficient to show that the burden of proof should shift to respondent under section 7491 as to any relevant factual issue. Therefore, the

---

records from Mrs. Chernomordikov's separate accounts in November 2013 showing deposits totaling $237,619 and $238,423, respectively. Ultimately, we need not resolve this discrepancy because respondent has not moved to increase the deficiency to reflect the amount in the bank deposits analysis.

**[\*12]** burden of proof regarding the deficiency generally remains with petitioners.

In an unreported income case, however, the Commissioner must establish an evidentiary foundation connecting the taxpayer with the income-producing activity, *Weimerskirch v. Commissioner*, 596 F.2d 358, 361 (9th Cir. 1979), *rev'g* 67 T.C. 672 (1977), or demonstrate that the taxpayer actually received income, *Edwards v. Commissioner*, 680 F.2d 1268, 1270–71 (9th Cir. 1982). Once the Commissioner has met this threshold requirement, the burden shifts to the taxpayer, who must establish by a preponderance of the evidence that the deficiency determination was erroneous. *Hardy v. Commissioner*, 181 F.3d 1002, 1004 (9th Cir. 1999), *aff'g* T.C. Memo. 1997-97. The bank deposits analysis connects Mr. Chernomordikov with the income-producing activity of ONY Sales and therefore satisfies this threshold requirement, shifting the burden back to petitioners.

III.   *Unreported income*

Gross income includes "all income from whatever source derived," § 61(a), and thus includes all accessions to wealth over which the taxpayer has complete control, *see Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 431 (1955). As the Supreme Court explained, "[a] gain 'constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it.'" *James v. United States*, 366 U.S. 213, 219 (1961) (quoting *Rutkin v. United States*, 343 U.S. 130, 137 (1952)). A taxpayer has control "when the taxpayer is free to use the funds at will." *Cortes v. Commissioner*, T.C. Memo. 2014-181, at \*8 (citing *Rutkin*, 343 U.S. at 137), *aff'd*, 691 F. App'x 899 (9th Cir. 2017). We also have held that "[t]he use of funds for personal purposes indicates dominion and control, even if these funds are in an account titled in a name other than the taxpayer's." *E.g.*, *Edwards v. Commissioner*, T.C. Memo. 2016-117, at \*15.

A taxpayer must maintain books and records establishing the amount of his or her gross income. § 6001. If a taxpayer fails to maintain and produce the required books and records, the Commissioner may determine the taxpayer's income by any method that clearly reflects income. *See* § 446(b); *Petzoldt v. Commissioner*, 92 T.C. 661, 693 (1989); Treas. Reg. § 1.446-1(b)(1). The Commissioner's reconstruction of income "need only be reasonable in light of all surrounding facts and circumstances." *Petzoldt*, 92 T.C. at 687.

**[\*13]** Bank deposits constitute prima facie evidence of income, *see Tokarski v. Commissioner*, 87 T.C. 74, 77 (1986), and the bank deposits method is a permissible method of reconstructing income, *see Clayton v. Commissioner*, 102 T.C. 632, 645 (1994). The Commissioner need not show the likely source of a deposit treated as income but "must take into account any nontaxable source or deductible expense of which [he] has knowledge" in reconstructing income using the bank deposits method. *Id.* at 645–46. The Commissioner need not follow any "leads" suggesting that a taxpayer has deductible expenses. *DiLeo v. Commissioner*, 96 T.C. 858, 872 (1991), *aff'd*, 959 F.2d 16 (2d Cir. 1992).

After the Commissioner reconstructs the taxpayer's income and determines a deficiency, the taxpayer bears the burden of proving that the bank deposits analysis is unfair or inaccurate. *See Clayton*, 102 T.C. at 645; *DiLeo*, 96 T.C. at 883. The taxpayer must prove that the reconstruction is in error and may do so by proving that all or part of a deposit is not taxable. *See Clayton*, 102 T.C. at 645.

Because petitioners did not maintain books and records sufficient to establish their income and expenses, RA Ho reconstructed their income using the bank deposits method. To support the analyses, respondent produced bank account statements and deposit records, including checks and withdrawal slips from bank accounts over which one or both petitioners had signatory authority and exercised control. These records establish that petitioners received, but did not report, income for the years in issue.

Petitioners argue that the bank accounts were ONY Sales', not petitioners', and ONY Sales was not owned by Mr. Chernomordikov. But we have found above that Mr. Chernomordikov ran the business, had control over the business bank accounts, and considered them no different from his personal accounts. At trial he testified that in 2012 and 2013 he "didn't really feel like there was a difference" between ONY Sales' bank accounts and his personal bank accounts. When questioned how ONY Sales paid him for his work in 2011, because he received no paycheck, he testified that he "used the money from ONY Sales for personal expenses." Mr. Chernomordikov's admission directly contradicts petitioners' argument that cash withdrawn from ONY Sales accounts should be considered cost of goods sold. It instead supports RA Ho's characterization of Mr. Chernomordikov's cash withdrawals from ONY Sales accounts as taxable income to the extent not otherwise explained.

[*14] RA Ho's bank deposits analyses are well supported, and we accept the reconstruction of petitioners' income and expenses as reasonable. Petitioners have not produced any evidence supporting their contention that the bank deposits analyses are unfair or flawed. We did not find Mr. Chernomordikov's testimony, that Mr. Lee alone guided him, to be credible; and, as noted above, Mr. Lee did not appear. Petitioners offered no other evidence to back up their claim that funds that they used as their own were not income to them. Nor did they offer any evidence to refute how specific entries in the bank deposits analyses were classified. The record establishes that Mr. Chernomordikov viewed ONY Sales' funds as "money to be used" and spent it as he wished including on personal expenses.

Similarly, we see no basis to question the unreported income attributed to petitioners' ONY Homes account or Mrs. Chernomordikov's separate account. RA Ho's bank deposits analysis for Mrs. Chernomordikov analyzed deposits into bank accounts under her name. Mrs. Chernomordikov did not offer any evidence that RA Ho's analysis was unfair or inaccurate. Her inability to recollect the details of the 2013 year (and general lack of involvement in financial matters) fails to provide a basis to establish that the deposits were not income to her.[15] We will sustain respondent's determinations with respect to Mrs. Chernomordikov's unreported income for 2013.

IV.  *Cost of goods sold*

Cost of goods sold is an offset subtracted from gross receipts in determining gross income. *See Metra Chem Corp. v. Commissioner*, 88 T.C. 654, 661 (1987); Treas. Reg. §§ 1.61-3(a), -6(a). Any amount claimed as cost of goods sold must be substantiated, and taxpayers are required to maintain records sufficient for this purpose. § 6001; *Nunn v. Commissioner*, T.C. Memo. 2002-250, 2002 WL 31163099, at *7; Treas. Reg. § 1.6001-1(a).

Mr. Chernomordikov claimed that cost of goods sold reduced ONY Sales' gross receipts for tax years 2012 and 2013 and therefore should reduce any income we attribute to him from his use of ONY Sales' funds. He produced no documents to support his claim. His explanation that he was simply following the practice of his late stepfather and complying with suppliers' requests to deal in cash cannot substitute for actual

---

[15] The bank deposits analysis for Mrs. Chernomordikov's accounts supports a conclusion that respondent has met his burden of showing omission of at least $238,525. *See supra* note 14.

**[\*15]** evidence. Nor can he hide behind purported reliance on an absent professional to maintain records of costs of goods sold any more than he can rely upon the absent professional's advice to avoid tax on income in ONY Sales' accounts that he used as his own. While he may have used some of the cash withdrawn for business expenses, he offered no proof beyond the amount that respondent already conceded. Our latitude to estimate amounts on the basis of testimony requires more support than petitioners have offered, especially when Mr. Chernomordikov admitted at trial that he used funds in ONY Sales' accounts for his personal expenses.[16] We will sustain respondent's determinations with respect to Mr. Chernomordikov's unreported income for 2012 and 2013.

V.     *Petitioners' 2013 filing status and community property income*

The parties now appear to dispute petitioners' filing status for 2013.

Taxpayers can secure joint filing status only by filing a joint tax return. § 6013(a); *see* Treas. Reg. § 1.6013-1(a). Petitioners did not file a tax return for 2013 and therefore necessarily did not file a joint tax return. They therefore would not be entitled to the rates available under section 6013 to a married individual who files a tax return jointly with his or her spouse. *See* § 1(a)(1). But the parties appear to have settled this issue before trial in favor of petitioners. In a Stipulation of Settled issues filed in each docket the parties stipulated that petitioners are "entitled to 'married filing jointly' filing status for the 2013 tax year."[17] In his Posttrial Brief respondent asserted that petitioners' proper filing status for 2013 is married filing separate. He offered no reason as to why we should relieve him of the binding effect of the parties' Stipulations settling this issue. *See* Rule 91(e); *Stamos v. Commissioner*, 87 T.C. 1451, 1454, 1456 (1986) (explaining that generally stipulations of fact are binding upon the parties and that this Court is bound to enforce

---

[16] The Court may estimate cost of goods sold under a variation of the *Cohan* rule, *see Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir. 1930), even when cost of goods sold is not fully substantiated, provided there is a reasonable basis to do so, *Olive v. Commissioner*, 139 T.C. 19, 34 (2012), *aff'd*, 792 F.3d 1146 (9th Cir. 2015). Petitioners did not raise the *Cohan* rule on brief, nor did they offer a reasonable basis to estimate cost of goods sold here.

[17] The parties announced they had agreed to the settlement reflected in the Stipulations at the beginning of trial and filed the signed Stipulation of Settled Issues immediately after trial.

**[\*16]** them). Nor do we see one. We therefore will hold him to it: Petitioners are entitled to married filing jointly status for 2013.

The parties agree that petitioners were married in California on June 22, 2013, and that petitioners are jointly and severally liable for the federal income tax payable on their earned income for 2013. Petitioners submitted no evidence to establish that they elected to treat any of their community property separately. We therefore do not need to address what was community property. Rule 155 computations should eliminate any duplicate unreported income amounts noted on RA Ho's 2013 bank deposits analyses for petitioners. *See supra* p. 9.

VI. *Additions to tax*

The Commissioner bears the burden of production with respect to a taxpayer's liability for additions to tax and penalties. *See* § 7491(c); *Higbee v. Commissioner*, 116 T.C. 438, 446–47 (2001). Once the Commissioner meets the burden of production, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect or that the taxpayer has an affirmative defense such as reasonable cause. *See Higbee*, 116 T.C. at 446–47.

Petitioners dispute the constitutionality of the additions to tax in these cases in the light of the U.S. Supreme Court's decision in *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024), arguing that the Seventh Amendment to the U.S. Constitution guarantees a right to trial by jury here. We rejected its extension to a fraud penalty under section 6663 in *Silver Moss Properties, LLC v. Commissioner*, No. 10646-21, 165 T.C., slip op. at 6, 15–16 (Aug. 21, 2025), and to accuracy-related penalties under section 6662 in *Riddle Aggregates, LLC v. Commissioner*, No. 31104-21, 165 T.C., slip op. at 4–5 (Dec. 15, 2025). In *Silver Moss*, we explained that the collection of revenue and related penalties falls under the public rights exception to the Seventh Amendment. *Silver Moss*, 165 T.C., slip op. at 15–16. For the same reasons, we hold that this Court has jurisdiction to consider the imposition of additions to tax for failure to file under section 6651(a)(1), fraudulent failure to file under section 6651(f), failure to pay under section 6651(a)(2), and failure to make estimated tax payments under section 6654(a).

A. *Failure to file under section 6651(f)*

We now consider whether Mr. Chernomordikov is liable for additions to tax under section 6651(f) for fraudulent failure to file for tax years 2012 and 2013.

**[\*17]** Section 6651(a)(1) authorizes the imposition of an addition to tax of 5% of the tax required to be shown on a tax return for each month for which there is a failure to file a tax return, up to 25% in the aggregate, unless the taxpayer proves that such failure is due to reasonable cause and not due to willful neglect. Whether a taxpayer has "reasonable cause" within the meaning of section 6651(a)(1) depends on whether the taxpayer exercised "ordinary business care and prudence" but was nevertheless unable to file the tax return within the prescribed time. *United States v. Boyle*, 469 U.S. 241, 246 (1985); Treas. Reg. § 301.6651-1(c)(1). Section 6651(f) increases the addition to tax for fraudulent failure to file to 15% of the tax required to be shown on the tax return for each month, up to 75% in the aggregate. An SFR prepared by the Commissioner under section 6020(b) is not a return for purposes of section 6651(f). *See* § 6651(g)(1).

To decide whether a taxpayer fraudulently failed to file under section 6651(f) we consider "whether the taxpayer (1) failed to timely file a return for the taxable year where there was a tax liability required to be shown on a return (2) because of fraudulent intent." *Porter v. Commissioner*, T.C. Memo. 2015-122, at \*44. The Commissioner must prove fraud by clear and convincing evidence. *See* § 7454(a); Rule 142(b); *Clayton*, 102 T.C. at 646. Fraud is established by showing that a "taxpayer intended to evade tax believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such tax." *Clayton*, 102 T.C. at 647. Fraud may be established by circumstantial evidence. *Petzoldt*, 92 T.C. at 699. The same factors relevant to determining fraudulent intent under section 6663 are relevant to determining fraudulent intent for failure to file. *See Clayton*, 102 T.C. at 653; *see also Mohamed v. Commissioner*, T.C. Memo. 2013-255, at \*20.

Courts often rely on various "badges of fraud" to find circumstantial evidence of fraud. *See Bradford v. Commissioner*, 796 F.2d 303, 307–08 (9th Cir. 1986), *aff'g* T.C. Memo. 1984-601. These badges focus on whether the taxpayer engaged in certain conduct that is indicative of fraudulent intent, such as (1) understating income; (2) failing to maintain adequate records; (3) offering implausible or inconsistent explanations; (4) concealing income or assets; (5) failing to cooperate with tax authorities; (6) engaging in illegal activities; (7) providing incomplete or misleading information to the taxpayer's tax return preparer; (8) offering false or incredible testimony; (9) filing false documents, including filing false income tax returns; (10) failing to file tax returns; and (11) engaging in extensive dealings in cash. *See id.*;

[*18] *Recklitis v. Commissioner*, 91 T.C. 874, 910 (1988). The existence of any one badge is not dispositive, but the existence of several badges is persuasive circumstantial evidence of fraud. *Niedringhaus v. Commissioner*, 99 T.C. 202, 211 (1992).

Respondent has carried his burden of production, showing that Mr. Chernomordikov had a filing obligation for tax years 2012 and 2013 and did not file tax returns. *See Gates v. Commissioner*, 135 T.C. 1, 14 (2010). Mr. Chernomordikov has not shown that he had reasonable cause for failing to file the tax returns. His explanation at trial—that he assumed that his tax returns had been filed—was underwhelming. At the least he should have asked questions; he knew or should have known that he had not signed tax returns for 2012 and 2013. The record does not include even a draft 2012 tax return.

> It requires no special training or effort to ascertain a deadline and make sure that it is met. The failure to make a timely filing of a tax return is not excused by the taxpayer's reliance on an agent, and such reliance is not "reasonable cause" for a late filing under § 6651(a)(1).

*Boyle*, 469 U.S. at 252. The question we now must answer is whether respondent has shown by clear and convincing evidence that Mr. Chernomordikov had the requisite fraudulent intent.

Respondent's alleged evidence of fraud does not convince us that respondent has carried his burden of proof. Respondent highlights the following badges: Mr. Chernomordikov did not report income over several tax years, he did not maintain adequate records, he did not provide the IRS with records (and through his representatives provided incomplete information), he offered implausible and inconsistent explanations to the IRS (and this Court), he did not make estimated tax payments, and he dealt predominantly in cash.

Respondent's strongest evidence of fraudulent intent is the email from Ms. Nueve advising Mr. Chernomordikov that ONY Sales needed to report some wage income to him to match his high mortgage interest and avoid drawing IRS attention. But Ms. Nueve's email specifically stated that ONY Sales is a corporation, so the income would not pass to him.

Respondent's next strongest piece of evidence is the alteration of ONY Sales' records after respondent's investigation began. However,

**[\*19]** petitioners' involvement in this alteration is not explained.[18] Rather, respondent asks us to infer that an inexperienced businessman directed his experienced bookkeeper to make the alterations. We have doubts about Mr. Chernomordikov's credibility and lack of sophistication but will not use an inference built on our doubts to fill a gap in respondent's proof.

Additionally, Mr. Lee's 2016 email to Mr. Chernomordikov in which Mr. Lee writes that he misspoke and ONY Homes' returns had not been filed could have caused Mr. Chernomordikov to conclude that Mr. Lee was on top of the filing requirements and made only this mistake. Again, Mr. Lee's absence presents an evidentiary problem.[19]

We also found the testimony and evidence in the record about what information was provided to the IRS to be conflicting. RA Ho's interview notes taken during her examination regarding ONY Sales list account numbers for Mr. Chernomordikov's personal bank accounts, but RA Ho testified she received no bank account information from Mr. Chernomordikov. Confronted with her interview notes, she then stated she received incomplete bank records.

Respondent also argues that Mr. Chernomordikov's interaction with the lenders is evidence of his fraudulent intent not to file. Petitioners explained that mistakes on the bank account application for ONY Homes were made by a bank employee who completed the application for Mr. Chernomordikov and erroneously entered ONY Homes' date of establishment and tax status. Mr. Chernomordikov also testified that he was estimating on the application that ONY Homes had $1.5 million in gross annual sales, not stating that it had achieved that amount of sales. His estimate appears to be a stretch, coming as it did just after the formation of ONY Homes, but the possibility that a bank employee made clerical errors is plausible.

Lastly, we question whether the dealings in cash represent a badge of fraud here. Mr. Chernomordikov used his own Social Security number when completing the necessary forms for withdrawal, and

---

[18] Both RA Ho and Ms. Nueve testified that it was Ms. Nueve who altered the files to make them match the tax return prepared by Mr. Lee.

[19] Mr. Lee's failure to testify does not mean that petitioners have avoided fraud simply because their tax return preparer did not appear (or that other taxpayers in the future could do so). Critical here was respondent's decision not to call Mr. Lee when he was available, combined with the lack of other clear and convincing proof of Mr. Chernomordikov's fraudulent intent.

[*20] nothing in the record suggests that he tried to avoid the currency transaction reports by withdrawing smaller amounts. He told Ms. Nueve and RA Ho about them. Accepting that dealing in cash was just the way the business was run may not have been a smart business move, but he was not trying to hide his cash dealings.[20]

Respondent has not demonstrated by clear and convincing evidence that Mr. Chernomordikov had fraudulent intent. While his lack of education and sophistication does not excuse him from his tax obligations, it does distinguish him from the taxpayer in *Fiore v. Commissioner*, T.C. Memo. 2013-21, cited by respondent. There the taxpayer (before a conviction for tax evasion) was a tax attorney with an accounting background which we considered to be one of the most important factors supporting fraud, floating over our analysis of all of the other badges. *Id.* at *17. Thus, for example, in considering whether the taxpayer was willfully blind, we emphasized that his education and experience would have alerted him that he likely was failing to report substantial income. *Id.* at *29.

Respondent's failure to call Mr. Lee leaves a hole in respondent's proof of fraud by clear and convincing evidence that we cannot fill with an inference, particularly in the light of Mr. Chernomordikov's lack of education and experience. Nor will we fill that hole with the testimony of witnesses we did not find credible. We therefore hold that Mr. Chernomordikov is not liable for additions to tax for fraudulent failure to file under section 6651(f) for tax years 2012 and 2013.

B.      *Failure to file under section 6651(a)(1)*

We now address whether Mr. Chernomordikov is liable for additions to tax under section 6651(a)(1) for failure to timely file for tax year 2012 and 2013 (in the alternative to fraudulent failure to file) and whether Mrs. Chernomordikov similarly is liable for an addition to tax under section 6651(a)(1) for tax year 2013.

The parties agree that Mr. Chernomordikov did not file a tax return for 2012 or 2013 and Mrs. Chernomordikov did not file a tax return for 2013, and petitioners do not attempt to argue that they were not required to do so. Respondent has met his burden of production with respect to the section 6651(a)(1) additions to tax. Petitioners have not

---

[20] When asked whether it seemed odd that his suppliers required payments in cash, Mr. Chernomordikov replied: "I mean, that's just what was done. I mean, is it odd? Yeah, maybe, but that's just how the business was run."

**[\*21]** demonstrated that they exercised the ordinary care necessary to excuse them from liability for the section 6651(a)(1) additions to tax. And they cannot show reasonable cause by claiming reliance on Mr. Lee or Golden Gate as we explained above.

We therefore conclude that Mr. Chernomordikov is liable for additions to tax under section 6651(a)(1) for tax years 2012 and 2013 and that Mrs. Chernomordikov is liable for an addition to tax under section 6651(a)(1) for 2013 for failing to file their tax returns for those years.

C.    *Failure to pay under section 6651(a)(2)*

We next consider whether petitioners are liable for additions to tax for failure to pay under section 6651(a)(2), or whether they have reasonable cause for failure to pay.

Section 6651(a)(2) provides for an addition to tax when a taxpayer fails to pay timely the tax shown on a return, unless the taxpayer proves that the failure was due to reasonable cause and not due to willful neglect. A substitute for return prepared by the IRS pursuant to section 6020(b) is treated as the "return" filed by the taxpayer for purposes of section 6651(a)(2). *See* § 6651(g). For each month or fraction thereof for which a failure to pay continues, section 6651(a)(2) adds 0.5% of the tax required to be shown on the return, up to a maximum addition of 25%. If a taxpayer fails to file and fails to pay, then for that month or fraction thereof the addition to tax will be the difference between the addition for the failure to file and the addition for the failure to pay. *See* § 6651(c)(1).

Petitioners did not pay the tax shown on the SFRs prepared by the IRS. They have not established reasonable cause for this failure. Mr. Chernomordikov (who was responsible for household finances) knew or should have known he was not making tax payments. He did not authorize Mr. Lee or Golden Gate to make those for him. And he knew he paid Mr. Lee and Golden Gate a percentage of his tax savings for their advice. He got the advice he wanted and did not question it. He may complain now that Mr. Lee was a bad actor, but he cannot hide behind the bad advice and Mr. Lee's absence from trial to establish reasonable cause. He bears the burden of proving reasonable cause and his failure to call Mr. Lee leaves a hole in his proof (just as much as respondent's failure to call Mr. Lee left a hole in respondent's proof of fraudulent intent). And Mrs. Chernomordikov does not remember any

[*22] details from these years much less explain what efforts she undertook to comply with the tax laws. We therefore conclude that Mr. Chernomordikov is liable for additions to tax under section 6651(a)(2) for tax years 2012 and 2013 and that Mrs. Chernomordikov is liable for an addition to tax under section 6651(a)(2) for 2013.

D.     *Failure to make estimated tax payments under section 6654*

Finally, we consider whether petitioners are liable for additions to tax for failure to make estimated tax payments under section 6654(a).

Section 6654(a) imposes an addition to tax on an individual who underpays his or her estimated tax. The calculation assumes four required installment payments of the taxpayer's estimated tax liability. § 6654(c) and (d). Each required installment is equal to 25% of the "required annual payment." § 6654(d). The required annual payment generally is equal to the lesser of (1) 90% of the tax shown on the taxpayer's return for the year (or, if no return is filed, 90% of the taxpayer's tax for the year) or (2) 100% of the tax shown on the return, if the taxpayer filed a return, for the immediately preceding taxable year. § 6654(d)(1)(B); *Wheeler v. Commissioner*, 127 T.C. 200, 210–11 (2006).

The record shows that petitioners did not make the requisite estimated tax payments. We hold Mr. Chernomordikov is liable for an estimated tax penalty under section 6654(a) for 2012, and petitioners are jointly liable for the same penalty for 2013.

1.     *2012*

Mr. Chernomordikov filed a return for the 2011 tax year. While respondent leaves the prior year tax liability blank in their Explanation of the Estimated Tax Penalty, Mr. Chernomordikov's 2011 return is in the record, and it lists his tax liability for 2011 as $1,147. Respondent calculates 90% of the 2012 liability to be $1,541,792. Applying, section 6654(d)(1)(B), we therefore conclude that Mr. Chernomordikov's required annual payment for 2012 was $1,147.

2.     *2013*

We concluded above that petitioners are entitled to married filing jointly status for 2013. The regulations provide a method to compute the required annual payment by adding together what both spouses reported for the prior year. *See* Treas. Reg. § 1.6654-2(e)(3). However,

**[\*23]** since Mr. Chernomordikov did not file a return for 2012, the amount reported on their prior year's returns cannot be calculated. Rather their 2013 required annual payment was 90% of their tax liability for that year. And because we have concluded that petitioners are entitled to married filing jointly status, we also conclude that Mrs. Chernomordikov is not liable for a separate section 6654 penalty.[21] We therefore conclude that petitioners' required annual payment was 90% of their tax for 2013 for purposes of Rule 155 computations.

We have considered all arguments made and, to the extent not addressed above, conclude that they are moot, irrelevant, or without merit.

Because of concessions,

*Decisions will be entered under Rule 155.*

---

[21] Respondent proposed a finding of fact that Mrs. Chernomordikov filed a return for 2012, to which petitioners did not object, citing the estimated tax penalty calculation in the 2013 Notice of Deficiency. A copy of the actual return is not in the record; nor is an account transcript showing how much, if any, tax she reported, owed, or paid for 2012. The 2013 Notice of Deficiency lists her 2012 tax liability as zero, and the computation for the estimated tax penalty uses 90% of the current year tax liability as the required annual payment. We note that the 2012 Notice of Deficiency for Mr. Chernomordikov leaves his 2011 tax liability blank. Consequently, we are hesitant to rely upon either Notice of Deficiency to establish the amount reported on the prior year returns. Therefore, under *Wheeler*, 127 T.C. at 212, we would conclude that respondent has not met his burden of proof as to Mrs. Chernomordikov's separate section 6654 penalty for 2013. *See, e.g., Feige v. Commissioner*, T.C. Memo. 2025-88; *Harvey v. Commissioner*, T.C. Memo. 2023-95. Ultimately, whether Mrs. Chernomordikov filed a 2012 return and how much tax she reported does not change the outcome here; the required annual payment for the joint return is based on petitioners' 2013 tax liability because Mr. Chernomordikov failed to file a return for 2012.